UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

G.SAIF SABREE, PRO SE,
                PLAINTIFF/PETITIONER,

VS.

JOHN MARSHALL, JR., SUPERINTENDENT
MASSACHUSETTS CORRECTIONAL INSTITUTION
CEDAR JUNCTION; STEVE DE'ORSEY, SARGEANT
MASSACHUSETTS CORRECTIONAL INSTITUTION
CEDAR JUNCTION; JOHN DOE, CAPTAIN/SHIFT
COMMANDER MASSACHUSETTS CORRECTIONAL
INSTITUTION CEDAR JUNCTION; ALEX
RODRIGUEZ, CORRECTIONAL OFFICER
MASSACHUSETTS CORRECTIONAL INSTITUTION
CEDAR JUNCTION; PAUL CONLEY, SARGEANT
MASSACHUSETTS CORRECTIONAL INSTITUTION
CEDAR JUNCTION; JOHN DOE PADVAIKAS,
CORRECTIONAL OFFICER MASSACHUSETTS
CORRECTIONAL INSTITUTION CEDAR JUNCTION;
SCOTT GALSBAND, SARGEANT MASSACHUSETTS
CORRECTIONAL INSTITUTION CEDAR JUNCTION
AND JOHN DOE BRODBECK, CAPTAIN
MASSACHUSETTS CORRECITONAL INSTITUTION
CEDAR JUNCTION,
                DEFENDANTS/RESPONDENTS.

RECEIVED
MAR 3 1 2005

C.A. NO.

05 - 10660 WGY
Refered to MJ JG Dein

I.   VERIFIED CIVIL RIGHTS COMPLAINT WITH A JURY DEMAND

    1. This is a § 1983 action filed by G.Saif Sabree, a pro se
state prisoner, who is alleging, inter alia, violaitons of his
constitutional rights, and he is seeking declaratory judgment,
injunctive relief and damages. The plaintiff also request a trial
by jury.

II.   JURISDICTION.

    2. This is a civil rights action pursuant to 42 U.S.C.A. §§
1983 et seq. This court also has jurisdiction pursuant to 28 U.S.C.A.
1343. The plaintiff also invokes the pendent jurisdiction of this
court over all claims derived from a common set of facts.

III.   PARTIES.

    3. The plaintiff, G.Saif Sabree, is a pro se state prisoner,

who at all times relevenat to the hereinafter allegd events was
incarcerated at the Massachusetts Correctional Institution at Cedar
Junction (MCI-Cedar Junction/MCI-CJ), at Walpole, Mass. 02071,
under the jurisdiction of the Massachusetts Department of Correction,
who normal place of business is located at 50 Maple street, suite 3,
Milford, Mass. 01757.

4.   The defendent, John Marshall, Jr., if the former
Superintendent of the Massachusetts Correctional Institution at
Cedar Jucniton (MCI-Cedar Junction/MCI-CJ), and was responsible for
the day to day operations and managment of MCI-CJ, and he was alti-
mately respnsible for the training and supervision of its correct-
ional employees at MCI-CJ, whose normal place of business is located
at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

5.   The defendant, Steve De'Orsey, is a sargeant at MCI-CJ and
he is assigned to the innerperimeter security (IPS) team and he is
a subordinate of the defendant Marshall, Jr., whose prinicpal of
business is located at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

6.   The Defendant, John Doe #1, was the 7:00 a.m. to 3:00 p.m.
captain/shift commander on the date of the alleged events, and he is
a subordinate of the defendant Marshall, Jr., whose principal place
of business is located at P.O. Box 100 - Route 1A, Walpole, Mass.
02071.

7.   The defendant, Alex Rodriguez, is a correctional officer
and he is also assigned to the innerperimeter security (IPS) team
and he is a subordinate of the defendant, Marshall, Jr., whose
principal place of business is located at P.O. Box 100 - Route 1A,
Walpole, Mass. 02071.

8. The defendant, Paul Conley, is a sargeant and on the date of the alleged events, he was assigned to the Bristol housing units as the acting unit team manager, he is a subordinate of the defendant Marshall, Jr., whose principal place of business is located at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

9. The defendant, John Doe Padvaikas, is a correctional officer and a subordinate of the defendant Marshall, Jr., whose principal place of business is located at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

10. The defendants, Scott Galsband, is a sargeant and on the date of the alleged events, he was assigned to the Suffolk housing units as the acting unit team manager, he is a subordinate of the the defendant Marshall, Jr., whose principal place of business is located at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

11. The defendant, John Doe Brodbeck, is a captain and on the date of the alleged events, was assigned as the unit team captain, and he is a subordinate of the defendant Marshall, Jr., whose principal place of business is located at P.O. Box 100 - Route 1A, Walpole, Mass. 02071.

12. During all times relevant to the hereinafter alleged events, the defendants acted collectively and individually, and are being sued in their personal and official capacities, as they were "acting under color of state law."

IV.    STATEMENT OF THE FACTS.

13. This § 1983 actions is being filed against the above and herein-named defendants which was commenced and administratively exhausted through out the state court system, and which the plaintiff now **says that** the state courts:

   a.  showed prejudice that resulted in a decision
       that was contrary to, or involved an unreasonable
       application of clearly established federal law as
       determined by the Supreme Court of the United
       States.

   b.  resulted in a decision that was based on a
       unreasonable determination of the facts in light
       of the evidence presented in the state court
       proceedings.

14. The plaintiff, at the time of the alleged incident, was
a documented and departmentally known prisoner and practioner of
the traditonal Islamic faith for more than 20 years prior to the
commencement of his complaint alleging violations of his federal
and state constitutional rights, against the above-named
defendants, collectively and individually, throught out the state
court judicial system.

15. Beginning on or about July 3, 1998, at about 11:00 a.m.,
while the plaintiff was confined at the Massachusetts
Correctional Institution Cedar Junction (MCI-CJ), at Walpole,
Mass., and housed in the Bristol-One segregation/housing unit
(seg/housing unit), and returning to the unit from his once per
week one hour outdoor recreation period, he was deliberately
forced by the defendants to submit to a "public outdoor full body
cavity strip searching," in the plain unobstructed view of
strangers of the opposite and same sex, e.g., female/male staff
and officers, and female and children visitors of other inmates.

16. The defendants forced the plaintiff, as a practicing
muslim, to submit to a demeaning, humiliating, dehumanizing,
embarassing and disrespectful public outdoor full body cavity
strip searching, which placed an unnecessary burden on his First
Amendment religious freedoms and practices, in violation of the
prohibitions against the cruel and unusual punishments of a

prisoner.

17. The defendants, Paul Conley, Scott Galsband and John-Doe Padvaikas, forced the plaintiff, under threat of being placed in more restrictive housing if he refused to comply with their order, to get completely naked by removing all clothing and handing the clothing items and etc to the defendants "outdoor's" and in front of his cell block in complete unobstructed view of members of the opposite sex, ¶16, supra, who were exiting and entering the main prison pedestrian security trap/entrance.

18. The public outdoor full body cavity strip search conducted by the defendants upon the muslim plaintiff, was an exaggerated response to alleged legitimate security objectives, which forced the plaintiff to expose his genitals, buttocks and his rectal area to the strangers of the opposite sex and to two other prisoners: Kenneth Barllet W52822, a black inmate and a lighter skinned hispanic inmate, about five feet, five inches in height and 120 lbs, who goes by the name of shorty and was transfered to the gang block shortly after the incident.

19. The defendants public outdoor full body strip searching of the plaintiff was a violation of his sincerely held religious beliefs and practices, and a deliberate violation of the defendants who ignored clearly established constitutional law relative to the seeking of alternate locations that would have been the least restrictive means to achieve the alleged legitimate prison security objectives,

when they forced the plaintiff to submit to a public outdoor full body cavity strip searching in the unobstructed view of members of the opposite sex, including children, which required the plaintiff to:

    a) remove all clothing, and hand the clothing items and etc to the attending officers who then searched his clothing;

    b) spread his fingers and show hands, back and front and wiggle fingers;

    c) open mouth and lift tongue;

    d) show each ear;

    e) raise arms to shoulder level stretched out to the sides;

    f) lift penis and testilces and move them to oneside and then ot the otherside;

    g) turn around and show back, lift each foot and show the soles of each foot and then

    h) bend over at the waist and spread his buttocks to the officers.

20. The actions of the defendants were a violation of the plaintiff's sincerely held religious beliefs and practices which he has held for more than 20 years and is supported by Qur'anic laws relative to states of dress and undress, which regulates the behavior between the sexes.

21. The defendants actions were an exaggeration to alleged legitimate prison security goals when they forced the plaintiff to expose himself to strangers of the opposite sex and others, including children, in complete and unobstructed view, without the defendants first attempting to exercise any available alternate locations that would have been the least restrictive means for the strip searching, such as the

well lite, clean and dry isolated exterior corridor that leads

to and from the plaintiff's cell block from the exercise yard

or one of the HSU (health services unit) cells or examination

rooms, or the newman section of the prison located in the

basement of the HSU no more than one-hundred feet away from

the site of the strip search of the plaintiff.

22. The Holy Qur'an, sura/chapter 24, ayats/verses 30,

31, 58 - 60, reads as follows:

ayats/verses 30 - 31:

Say to the believing men and women that they should
lower their gaze and guard their modesty, that will
make for greater purity for them and Allah is well
acquainted with all that they do. And say to the
believing women that they should lower their gaze and
guard their modesty, that they should not display
their beauty and ornaments except what ordinarily
appears thereof, that they should draw veils over their
bosoms and not display their beauty except to their
husbands, their father's, their husband's father, their
sons, their husband's sons, their brother's or their
brother's sons, or their sister's sons, or their women,
or the servants whom their right hand possess, or male
attendants free from sexual desire, or small children
who have no carnal knowledge of woman; and that they
should not strike their feet in order to draw attention
to their hidden ornaments. And O you Believers! turn
you all together towards All in repentence that you may
be successful.

ayats/verses 58 - 60:

O you who believe! let those whom your right hand
possess, and the children amoung you who have not come
of age ask your permission before they come into your
presence, on three occasions: before morning prayers;
while you doff (lift or remove) your clothing for the
noonday heat; and after the late night prayer. These
are your three times of undress. Outside those times
it is not wrong for you or for them to move about
attending each other. Thus does Allah make clear the
signs to you, for Allah is full of knowledge and wisdom.
But when the children amoung you come of age, let them
also ask for permission, as did those before them: Thus
does Allah make clear his signs to you: for Allah is
full of knowledge and wisdom. Such elderly woman as are
past the prospect of marriage, there is no blame on
them if they lay aside their outer garments, provided

they make not a wanton display of their beauty, but
it is best for them to be modest and Allah is one
who sees and knows all things.

Holy Qur'an, ayats/verses 30. 31 & 58 - 60, text, english
transliteration and commentary, by Abdullah Yusef Ali.
Exhibits A & B.

32. The defendants Conley and Galsband were familiar with
the plaintiff, his religion and with his sincerely held
religious beliefs and practices, as the defendants Conley and
Galsband were both supervising block officers who viewed and
reviewed the block's inmate program movement rosters to and
from the muslim masjid (mosque/chapel), as well as the
plaintiff's name being a primary indicator of his religion and
religious practices.

33. The defendants also knew of the plaintiff's dietary
religious requirements during the month of Ramadan (fasting),
and on the date of the public outdoor full body cavity strip
searching, the plaintiff was wearing around his neck on a
chain, a medalion, e.g., the Islamic crescent moon and star,
which staff knew only the muslim population wore as a display
of their religious beliefs and practices at MCI-CJ.

34. The public outdoor full body strip search conducted
by the defendants upon the plaintiff was a deliberate
violation and burden on his religious rights, beliefs and
practices under the First Amendment to the U.S. Constitution
and 103 Dept. of Corr. (DOC) 506.2(A)(Search
Policy/Recommended Strip Search Techniques): which reads in
pertinent part and carry the effect and force of law:

Strip searches of individual inmates should be

conducted in relative privacy usually by two
security personnel, rendering as dignity to the
situation as possible. Strip searches by members
of the opposite sex shall not be permitted, except
under extraordinary or emergency situations.

Exhib. C. 103 DOC 506.2(A)(Search Policy, 1998), supra.

35. Additionally, the defendants public strip search of
the plaintiff was an abuse of discretionary powers as well as
a malicious and sadistic and cruel and unusual punishment of a
prisoner, as an attempt to advance alleged legitimate prison
security goals to attempt to find alleged contraband, e.g.,
cigarette and/or cigarette butts that were brought into the
prison and smoked in the inmate recreation yard and left there
by staff/officers, which were not found on the plaintiff on
the date of the public outdoor strip search.

36. On or abot July 5, 1998, the plaintiff wrote a letter
to the John Marshall, Jr., superintendent MCI-CJ, and filed an
official complaint regarding the defendants subjecting him to
a public outdoor full body cavity strip searching in the
unobstructed view of members of the opposite sex, including
children of inmate visitors, which the plaintiff found
demeaning, humiliating, dehumanizing and disrespectful to him
as a muslim and black inmate, and the superintendent Marshall,
Jr., answered the plaintiff correspondence in writing which
essentially justified his subordinates actions, dated July 17,
1998. Exhib. D & E.

37. On or about July 24, 1998 several days following the
superintendent Marshall, Jr. answer to the plaintiff's July
5th correspondence. ¶36, supra, complaining about the public
outdoor strip searching, and as a continuing pattern of
tit-for-tat retaliation for his exercise of protected First

Amendment rights to petition for redress of grievances, the plaintiff was told by the defendant Conley, who was also the acting unit team manager, that the plaintiff had to move out of his freshly painted and neatly kept cell on the flats to a cell on the second tier.

38. The plaintiff's cell on the flats of the block was not only freshly painted and neatly kept, but it also had a a new stainless steel toilet and sink, and the cell which he was moved into on the second tier was dirty, in disrepair, smelled with a foul odor, and the stench of urine and feces, resulting from the old filthy, chipped rusted metal exposed and infectous bacteria ladden toilet and sink.

39. Toilet and sink facilities in his new cell, ¶38, supra, which placed the plaintiff at risk of infectous each time he had to use the facilities because of his not being provided with any reasonable alternative, and he was required to eat each of his three dailey meals in the cell and perform his five dailey prayers that mandated under Qur'anic law, and he was restricted to the cell 23 hours per day, seven days per week, in violation of the prohibitions against the cruel and unusual punishment of a prisoner and 105 Code of Mass. regulations (CMR) 451.117, 123 & 130(Department of Public Health Minimum Sanitation Standards), which arry force of law. Exhib. F, G & H.

40. Thereafter, on August 2, 1998, 9 days following the plaintiff's cell and tier change, at approximately 11:15 a.m., he was called out of his cell by his block officer Jeff Cardin, and told by the officer that he had to report to the

HSU (health services unit) and return to the cell block before the 11:40 a.m. major prison inmate count.

41. When I reported to the HSU and asked the duty officer who on the medical staff wanted to see me, it was at this time that the duty officer pointed to IPS (innerperimeter security team) officer Alex Rodriguez and said that he is the one who called you to the HSU and IPS Rodriguez then ordered the plaintiff to follow him into the isolated area of the HSU known as the newman section in the Basement of the HSU.

42. Once IPS Rodriguez and the plaintiff were alone in the HSU basement, IPS Rodriguez informed the plaintiff that someone, presumably another inmate, had sent a naked picture of a blond female along with a sexually explicit letter to the white female librarian Lori McNaught, whom the plaintiff had worked with for approximately six-months, prior to other IPS officers fabricating disciplinary charges to get the plaintiff fired from his prison job assignment as a inmate law clerk, see Sabree v. Marshall, Jr., Supt. MCI-Cedar Junction and others, WORCV.# 01-02204C, Worcester Superior Court, Worcester, Mass., which detailed what the inmate wanted to allegedly do sexually to her, and the letter had allegedly involved the plaintiff's name.

43. The plaintiff asked the IPS officer how did the letter involve him and his name and the IPS officer told the plaintiff that he did not want to go into that and then the plaintiff asked the IPS could he see the alleged naked picture and sexually explicit letter which the IPS alleged had been sent to the white female librarian with the plaintiff's name

signed on it and the IPS officer told the plaintiff that he had left the alleged picture and letter in his office.

44. The plaintiff then told IPS Rodriguez that he was willing to give him a hand writing sample to compare to that on the alleged letter if he needed it and IPS Rodriguez told the plaintiff that that had already been checked out by other sources and the IPS knew that the plaintiff did not write the letter, however, what IPS Rodriguez did want the plaintiff to provide him with before the plaintiff left the HSU basement was to be provided with informant information, i.e., with the name(s) of other inmates who the plaintiff may think may have have sent the naked picture and letter to the librarian and involved the plaintiff.

45. The plaintiff refuse to provide IPS Rodriguez with the so-called informant information which IPS Rodriguez requested from the plaintiff and the plaintiff told the IPS that he would have to check his others sources for information and it was at this time that IPS Rdoriguez became agitated with the plaintiff for refusing to provide him with the requested information and it was also at this time that IPS Rodriguez stated to the plaintiff in the form of a threatening question, "You're not going to give me a name?" to which the plaintiff stated to him "No. I'm not, so go check your other sources."

46. It was also at this time that the plaintiff attempted to leave the HSU basement when the phone rang and IPS Rodriguez gave the plaintiff a direct order to stay put as he was going to answer the phone, and as the plaintiff remained within hearing distance of the phone he could he IPS Rodriguez state

to someone on the other end of the phone line "that he's not giving me anything to go on (meaning no information)."

47. After IPS Rodriguez hung-up the telephone he turned to the plaintiff and again asked him in a threatening voice, "so your're not going to give me a name," to which the plaintiff answered "no" and left the basement of the HSU's newman section and returned to his cell block and five minutes later the major prison inmate count was conducted by his blcok officer.

48. After the major count was conducted and as the plaintiff sat in his cell waiting for the door to open in order for to go to the flats to get his lunch meal, his block officer Cardin came to his cell with his lunch meal and the plaintiff ask the officer why was he being feed in his cell and also being held on AA (awaiting actions) status when he had done nothing to expect to receive a disciplinary report (d-report), and officer Cardin stated to the plaintiff that as far as the officer knew the plaintiff was not going to get a d-report, but was placed on AA on the orders of the shift commander and he did not know why.

49. Thereafter, other inmates who lived in the cell block came to the plaintiff's cell to tell him that four other inmates who lived in the block whom the plaintiff did not know or associated with, had also been placed on AA status by the shift commander: 1) David Reyes, a hispanic inmate; 2) Reynard Grassey, a white inmate, who both lived on the plaintiff's tier; 3) Melvin Brown, a black inmate and Jonathan Kirkland, a black inmate who both lived on the third tier.

back down the tier and returned to the flats to where IPS Rodriguez was talking to the block officer.

54. When officer Cardin brought the plaintiff his lunch meal to the cell, he asked the officer why was he still on AA status and the officer told the plaintiff that he was told by the IPS that someone had sent a naked picture and sexually explicit letter tot he librarian and the letter had been signed "from the Sabree crew," but everyone knew that the plaintiff had been set-up.

55. The plaintiff asked officer Cardin how does that justify his AA lock-up and his alleged involvement with the other inmates if no one else's name is mentioned in the alleged letter but his, and officer Cardin then told the plaintiff that he would have to ask the IPS about that, because the plaintiff's AA lock-up was totally based on what the IPS told the shift commanderand the prison administration and how it all somehow involved the other four inmates.

56. On August 5, 1998 3 days following the plaintiff and other inmates AA lock-ups, ¶49, supra, and 2 days after acting IPS commander De'Orsey came into the cell block and talk with the hispanic and white inmates, ¶52, supra,    where no other prisoners were investigated but the plaintiff regarding the alleged naked picture and sexually explicit letter sent to the librarian, for possible disciplinary misconduct, the plaintiff and the other inmates were released from AA status without any administrative explanation for the inmates AA lock-ups.

57. Prisoners Reyes and Grassey came to the plaintiff's cell and told him the IPS De'Orsey told them that they were not

the ones suspected of sending the naked picture and letter to the librarian, but until they catch the individual who actually sent the picture and letter to the librarian, something would be put into their files stating their names were involved with the attempted harassment of a female staff member.

58. What the hispanic and white inmates wanted to know from the plaintiff was, was there anyone that the plaintiff could think of who might have been the one who sent the picture and letter to the librarian and did the plaintiff tell the truth about their names not being mentioned when the IPS called him to the HSU about the matter.

59. Later in the morning on August 5, 1998, the plaintiff was called to the HSU for an actual sick call to see the medical staff and on his return to his cell blcok he was called by another staff member <u>Rick Solomon</u> who the plaintiff has known for a number of yours and Solomon ask the plaintiff if he could talk to him.

60. Solomon told the plaintiff that he understood that the plaintiff had been locked-up along with other prisoners on AA status because his name was involved with the alleged naked picture and sexual letter that had been sent to librarian McNaught and the plaintiff told Solomon that it was true that he had been locked-up with the other inmates behind the alleged incident, and the IPS told the plaintiff that his name had been signed on the letter stating that it was from the "Sabree crew."

61. Solomon told the plaintiff without reservations that it had all been a lie told to him by the IPS and the

plaintiff's name was not even mentioned when he talk to librarian two days earlier, and Solomon went on to tell the plaintiff that he had to the librarian and she told him that the letter had at the top of it a drawing showing two people in a sexual position and the letter talked about what they wanted to do to her sexually and it had been signed from the "Melvin Brown crew," ¶49, supra, and the librarian had turned the letter over to the IPS, and they were going to investigate the incident.

62. Solomon also told the plaintiff that it was the IPS and probably other staff that involved his name in this incident along with the other inmates and the IPS were either trying to turn him into one of their snitches (informants) or they were were setting him up for something in retaliation for the law suits and other written complaints about the racial and religious harassment and discrimination by some of the officers carried out against the black muslim population, and the plaintiff was also told by Solomon to be careful and watch his back in the prison, because it had already been spread around the prison that he was the one who sent the picture and letter to the librarian and involved the other inmates in the incident. Exhib. I & J.

63. On August 10, 1998, 5 days following the plaintiff and the other 4 inmates release from the AA lockdown, the hispanic inmate Reyes became convinced that it was in fact the plaintiff who sent the alleged naked picture and sexually explicit letter to the librarian and involved him with it, and he entered the plaintiff's cell and started a fight with the plaintiff, because the IPS did not call anyone but the

Constitution/Declaration of Rights, M.G.L.A.c. 12, §§ 11H & 11I (the State Civil Rights Act), M.G.L.A. c. 30A, §§ 1 et seq (the State Administrative Procedures Act), M.G.L.A.c. 214, § 1B (Right to Privacy), 103 CMR 506.2A(Search Policy) and 105 CMR 451.117, 123 & 130 (Dept. of Public Health Minimum Sanitation Standards), which carry the effect and force of law.

70. The actions of the defendants Marshall, Jr., De'Orsey, John-Doe #1 and Rodriguez, as described in ¶40 - 66 of this complaint, violated his rights to the substantive due process and equal protection under law, pursuant to First, Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C.A. §§ 1983 et seq, against the curel and unusual punishment of a prisoner, for his exercise of protected constitutional activities.

71. The actions of the defendants Marshall, Jr., De'Orsey, John-Doe #1 and Rodriguez, as described in ¶40 - 66 of this complaint, violated the plaintiff's rights to the substantive due process and equal protection under law, pursuant to Articles One, Twelve and Twenty-Six to the Massachusetts Constitution/Declaration of Rights, and M.G.L.A. c. 12, §§ 11H & 11I, against the cruel and unusual punishment of a prisoner, for his exercise of protected constitutional activities.

VI.    PRAYERS OF RELIEF.

72. Issue a declaration that the actions of the defendants Conley, Galsband, Padvaikas and Brodbeck, as described in ¶13 - 39 of this complaint, violated the

plaintiff's rights to the substantive due process and equal protection under law, pursuant to the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C.A. §§ 1983 et seq, relative to the plaintiff's religious freedoms, beliefs and practices and to bodily integrity and privacy to shield his naked body and genitals from complete strangers and members of the opposite sex, male/female staff and officers, including women and children of inmate visitors, and retaliation for his exercise of protected constitutional activities.

73. Issue a declaration that the actions of the defendants Conley, Galsband, Padvaikas and Brodbeck, as described in ¶13 - 39 of this complaint, violated the plaintiff's rights to the substantive due process and equal protection under law, pursuant to Articles One, Two, Twelve, Fourteen, Twenty-Six and Fourty-Six, § One to the Massachusetts Constitution/Declaration of Rights and M.G.L.A. c. 12, § 11H & 11I, M.G.L.A. c. 214, § 1B(Right to Privacy), 103 DOC 506.2A(Search Policy) and 105 CMR 451.117, 123 & 130 (Dept. of Public Health Minimum Sanitation standards for the Dept. of Corr.), relative to the plaintiff's religious freedoms, beliefs and practices and to bodily integrity and privacy to shield his naked body and genitals from complete strangers and members of the opposite sex, male/female staff and officers, including women and children of inmate visitors, and as retaliation for his exercise of protected constitutional activities.

omissions and policy practices as described in ¶13 thru 66 of this complaintdid violate the plaintiff's rights, immunities and privileges to the substantive due process and equal protection under law, pursuant to the federal and state constitutions.

77. Issue a permanent injunction against the defendants, their agents and employees, successors in office as well as those who maybe acting in concert with them, from engaging in any retaliatory and punitive actions result from the plaintiff bringing this action.

78. Award the plaintiff <u>compensatory and actual damages</u> in the amount of One-Hundred Thousand dollars ($100.000) against each of the defendants: John Marshall, Jr., Steve De'Orsey, John-Doe #1; Alex Rodriguez; Paul Conley; John-Doe Padvaikas; Scott Galsband and John-Doe Brodbeck, and award the plaintiff <u>punitive damages</u> against each of the defendants in the maximum amount allowed under law.

79. Grant the plaintiff such further relief as this Court may deem just and equitable as he may be entitled to as a matter of law and the plaintiff <u>demands trial by jury</u>.

Respectfully submitted by

Dated:                          G.Saif Sabree W34619 pro
                                se, MCI-Norfolk/P.O. Box
                                43, Norfolk, Mass. 02056.

VII.    <u>VERIFICATION DECLARATION.</u>

I, G.Saif Sabree, hereby verify on oath according to law, that the following is turhful and accurate to the best of my personal knowledge, observations and beliefs of all facts,

**E X H I B I T   " A "**

Case 1:05-cv-10669-WGY   Document 2   Filed 3/31/2005   Page 21 of 64

R.N. pg. 14

EXHIBIT A

## S.24, A.29-31

And Allah has knowledge
Of what ye reveal
And what ye conceal.

30. Say to the believing men
That they should lower
Their gaze and guard[2983]
Their modesty: that will make
For greater purity for them:
And Allah is well acquainted
With all that they do.

31. And say to the believing women
That they should lower
Their gaze and guard[2984]
Their modesty; that they
Should not display their
Beauty and ornaments[2985]
What (ordinarily) appear
Thereof; that they should
Draw their veils over
Their bosoms and not display
Their beauty except

---

a watchout. But even here, of course, implied permission from the owner is necessary as a matter of common-sense. The question in this passage is that of refined privacy, not that of rights of ownership.

2983. The rule of modesty applies to men as well as women. A brazen stare by a man at a woman (or even at a man) is a breach of refined manners. Where sex is concerned, modesty is not only "good form": it is not only to guard the spiritual good of the stronger sex, but also to guard the weaker sex.

2984. The need for modesty is the same in both men and women. But on account of the differentiation of the sexes in nature, temperament, and social life, a greater amount of privacy is required for women than for men, especially in the matter of the uncovering of the bosom.

2985. Zīnat means both natural beauty and artificial ornaments. I think both are implied here, but chiefly the former. The woman is asked not to make a display of her figure except to the following classes of people: (1) her husband, (2) her near relatives whom a certain amount of nafsār [?] is permissible; (3) her women, (4) slaves, male and female, as they would be in constant attendance; but this item would now be blank, with the abolition of slavery; (5) men who are free from sexual desire and who usually frequent the houses; and (6) infants or small children before they get a sense of sex. Cf. also xxxiii. 59.

---

## S.24, A.31-32

Their beauty except
To their husbands, their fathers,
Their husbands' fathers, their sons,
Their husbands' sons,
Their brothers or their brothers'
    sons,
Or their sisters' sons,
Or their women, or the slaves
Whom their right hands
Possess, or male attendants
Free of sexual desires,
Or small children who
Have no carnal knowledge of
    women;

And that they
Should not strike their feet
In order to draw attention
To their hidden ornaments.[2996]
And O ye Believers!
Turn ye all together
Towards Allah in repentance that ye
May be successful.[2997]

32. Marry those among you
Who are single,[2998] and
The virtuous ones among
Your slaves, male or female:
If they are in poverty,

---

2996. It is one of the tricks of showy or unchaste women to tinkle their ankle ornaments, to draw attention to themselves.

2997. While all these details of the purity and good form of domestic life are being brought to our attention, we are clearly reminded that the chief object we should hold in view is our spiritual welfare. All our brief life on this earth is a probation, and we must make our individual, domestic, and social life all contribute to our holiness, so that we can get the real success and bliss which is the aim of our spiritual endeavour.

2998. The subject of sex ethics and manners brings us to the subject of marriage. "Single" (ayāmā, plural of Ayyim) here means any one not in the bond of wedlock, whether unmarried or lawfully divorced, or widowed.

E X H I B I T   " B "

E X H I B I T  " C "

| MASSACHUSETTS DEPARTMENT OF CORRECTION | AND COMPLIANCE UNIT |
|---|---|
| TITLE: SEARCH POLICY | NUMBER: 103 DOC 506 |

**PURPOSE:**   The purpose of this policy is to establish internal Departmental Procedures for searching person(s) and/area(s) within the legal boundaries of each institution. Searches are conducted to detect and prevent the introduction of contraband, recover missing or stolen property, to prevent escapes and other disturbances.

*R.A.# 21*

**REFERENCES:**   M.G.L. Chapter 124, Section 1 (a), (b) and (q)
DPH Drug Destruction Protocol
ACA Standards: 3-4184, 3-4185, 3-4186.

**APPLICABILITY:** Staff/Inmates            **PUBLIC ACCESS:** Yes

**LOCATION:**     DOC Central Policy File
Institution/Superintendent Central Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
- Director of the Policy Development and Compliance Unit
- Superintendents

**PROMULGATION DATE:** _5-28-93_   **EFFECTIVE DATE:** _3-23-99_

**CANCELLATION:**   This policy cancels all previous department policy statements, bulletins, directives, orders, notices, rules and regulations regarding planning which are inconsistent with this policy.

**SEVERABILITY CLAUSE:**   If any part of this policy is for any reason held to be in excess of the authority of the commissioner, such decision will not affect any other part of this policy.

OCTOBER 1998



EXHIBIT
G

506 - 1

Contraband Found.

## IV. Reporting

*R.A. pg. 22*

The superintendent must also establish standard reporting periods for cyclical searches.

## V. Metal Detector Guidelines

Each superintendent shall develop institutional procedures respecting the use of hand-held and walk-through metal detectors in order to safeguard against the risk posed to individuals with automatic implantable cardioverter defibrillator and/or pacemakers.

At a minimum, the following sign shall be posted permanently in any institutional area where such searches are commonly done:

"Use of hand-held and walk-through metal detectors may interfere with the operation of an automatic implantable cardioverter defibrillator and/or pacemaker. Notify staff if you have such a device and an alternative search procedure will be used."

## 506.03    STRIP SEARCHES

1. General - Strip searches should be employed, when necessary, for the close scrutiny of an inmate's person in determining if that inmate is carrying an item(s) considered to be contraband. Strip searches shall be employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband. Specific situations in which strip searches may be employed, include but are not limited to: entrance or exit from a secure perimeter and area, before and after court, medical trips, or visits; after the detection of an alleged disciplinary infraction; when custodial staff have reason to believe a person may possess contraband; after an escape or attempted escape; placement in segregation from the general population; routine searches of housing or work

OCTOBER 1998

506 - 5



EXHIBIT

Note: When strip searching an inmate, make note's on observations of tattoos with sketches if possible and send information to your institution's inner perimeter security unit.

2.    Recommended Strip Search Techniques



A.    Strip searches of individual inmates should be conducted in relative privacy usually by two security personnel, rendering as much dignity to the situation as possible. Strip searches by members of the opposite sex shall not be permitted, except under extraordinary or emergency situations.

B.    In conducting a strip search, the following procedures should be followed:  the inmate should remove his/her clothing, place each article in one location and then move at least five feet from that location.

C.    The custodial staff member should conduct a visual examination of the nude inmate, including:  hair, ears, nose, hands, fingers, under the tongue, armpits, pubic region, rectum, vaginal area, inner portion of the legs, between the legs, between the toes, and soles of feet. Any casts, bandages, or artificial limbs shall be scanned by a non-intrusive device if available.

D.    The inmate should be given verbal instruction, on removing the false teeth so item(s) and mouth area can be visually inspected, or on any other articles to be removed to expedite the situation.

E.    An examination of the inmate's clothing should follow, including:  turning clothing inside out, checking linings, cuffs, waistbands, seams, patches, collars, and shoe heels, soles and interior.  Eye glass cases, cigarette packages, watches and any other item found on the inmate's person shall be checked for contraband.

OCTOBER 1998

EXHIBIT
I

506 - 6

E X H I B I T   " D "

R. H. P. G. 16

EXHIBIT

C

To:  Mr. John Marshall - Supt. MCI-Cedar Junction

Fr:  Saif Sabree W34619 - B# 2 / C# 6

Re:  Complaint Regarding Unconstitutional and Unjustifed Strip Search Conducted
     In Plain View.

July 5, 1998                                    99-1724

Mr. Marshall,

     This letter is being written to your office to officially register my complai
regarding your subordinates (3 white male officers - 2 sergeants and 1 c.o.), who
intentionally subjected me to an unconstitutional and unjustified strip search, on
friday, July 3, 1998, at approximately 11:00am, which was conducted outdoors in fr
of housing unit B# 2, when returning from my one-hour-once-a-week-rec-period. The
strip search, which included bending over and etc, was conducted in plain view of
male and female officers working the towers, and the male and female staff, office
and visitors who were entering and leaving the front pedestrian trap.

     The actions of your subordinates, were not only unconstitutional and unjustif
but their actions were disrepectful and humiliating to me as a muslim and they wer
meant as a feeble attempt to provoke me into a verbal and physical confrontation,
justify their unreasonable and excessive use of force upon my person. Which is furt
demonstrative of a continuing patern of racist and religious persecution and haras
that is retaliatory and punitive for my exercise of a fundemental right, to petiti
the government, the Dept. of Corr. and this administration for redress of grievanc
that began around the first week of April 1998, after I made service of a civil su
upon members of your staff for alleged racially discriminatory treatment through t
disciplinary process and the joint letter that I wrote to your office, the Exec.
Secret. of the Dept. of Public safety and the Commissioner of Correcitons, again
detailing alleged racist and religious mistreatment of black muslim inmates at MCI-
Cedar Junct., primarily by the 7:00pm to 3:00pm shift, that continued up to your IP
officers setting me up with falsified and fabricated informant information and fals
disciplinary charges, which I strongly believe wasn't initiated on their subordinat
level.

     Mr. Marshall, inconclusion, I would like to thank you for your time and attent
to my complaint and concerns.

                                    Sincerely,

                                    [signature]

cc.  Elliot R. Levine, Esq.
     Attorney at Law
     26 Chestnut st.
     N.Quincy, Mass. 02169

     Kathleen O'Toole
     Execut. Secret. of the
     Dept. of Public Safety
     One Ashburton Pl.
     Boston, Mass. 02108

E X H I B I T   " E "



*The Commonwealth of Massachusetts*

*Executive Office of Public Safety*

*Department of Correction*

*M.C.I. Cedar Junction at Walpole*

*P.O. Box 100*

*South Walpole, Massachusetts 02071*

**Argeo Paul Cellucci**
*Governor*

**Kathleen M. O'Toole**
*Secretary*

**Michael T. Maloney**
*Commissioner*

**Kathleen M. Dennehy**
*Deputy Commissioner*

**John Marshall, Jr.**
*Superintendent*

July 17, 1998



R.A.pg.17

Saif Sabree, W-34619
MCI-Cedar Junction
Bristol II

Dear Mr. Sabree:

I am writing in response to your recent letter concerning a strip search that took place on Friday, July 3, 1998.

Suspicious activity was observed in the recreation area and it was determined that <u>all</u> inmates would be strip searched. The strip search included both Caucasian and Blacks, and all of the searches were conducted in the same manner. I find no justification to your claims that you have been racially or religiously harassed.

Sincerely,

John Marshall, Jr.
Superintendent

cc. Inmate's file
    File

E X H I B I T  " F "

CODE OF MASSACHUSETTS
REGULATIONS
TITLE 105:  DEPARTMENT OF
PUBLIC HEALTH
CHAPTER 451.000:  MINIMUM
HEALTH AND SANITATION
STANDARDS AND INSPECTION
PROCEDURES FOR CORRECTIONAL
FACILITIES

*Current through Register #887, dated January 21, 2009*

451.117: Toilet Fixtures

Toilet fixtures shall be of sanitary design and easily cleanable. They shall be kept clean and free of objectionable odors.

<General Materials (GM) - References, Annotations, or Tables>



Copyright (c) West Group 2000 No claim to original U.S. Govt. works

E X H I B I T    " G "

CODE OF MASSACHUSETTS
REGULATIONS
TITLE 105: DEPARTMENT OF
PUBLIC HEALTH
CHAPTER 451.000: MINIMUM
HEALTH AND SANITATION
STANDARDS AND INSPECTION
PROCEDURES FOR CORRECTIONAL
FACILITIES

*Current through Register #887, dated January 21, 2000*

451.123: Maintenance

Each toilet, handwash sink, bathing facility and shower and floor, and the surrounding area, shall be cleaned daily with hot water and an effective detergent disinfectant and kept in repair. It is recommended that a chlorine solution having a strength of not less than .05% available chlorine be used for cleaning. Facilities are encouraged to use non-toxic cleaning products whenever possible.

<General Materials (GM) - References, Annotations, or Tables>



EXHIBIT
K

Copyright (c) West Group 2000 No claim to original U.S. Govt. works

E X H I B I T   " H "

CODE OF MASSACHUSETTS
REGULATIONS
TITLE 105:  DEPARTMENT OF
PUBLIC HEALTH
CHAPTER 451.000:  MINIMUM
HEALTH AND SANITATION
STANDARDS AND INSPECTION
PROCEDURES FOR CORRECTIONAL
FACILITIES

*Current through Register #887, dated January 21, 2000*

451.130: Maintenance

All plumbing shall maintained in good repair and shall be free from leaks. All plumbing shall conform to 248 CMR Massachusetts Plumbing Code.

<General Materials (GM) - References, Annotations, or Tables>

*R.A. pg. 26*



EXHIBIT

Copyright (c) West Group 2000 No claim to original U.S. Govt. works

E X H I B I T   " I "

Mr. G.Saif Sabree     *R.A.pg. 17*
W34619
MCI-Cedar Junct.
P.O. Box 100
So.Walpole, MA. 02071

April 3, 1998

EXHIBIT
1

Mr. John Marshall
Supt. MCI-Cedar Junct.
P.O. Box 100
So.Walpole, MA. 02071

Mr. Micheal Maloney
Mass. Commr. Dept. of Corr.
Leverett Saltonstall Build.
100 Cambridge street
Boston, MA. 02202

Ms. Kathleen O'Toole
Mass. Execut. Secret.
Dept. of Public Safety
One Ashburtin Place
Boston, MA. 02108

Re: Complaint - Religious and/or Racial Persecution
                and Harassment.

Dear sirs/madam,

    For the past several weeks now here at MCI-Cedar Junction,
I as well as the other inmates who all happen to be black and
practice the Islamic Religion, have been intentionally subjected
to religious and racial harassment and/or persecution, for no
other reason(s) than our exercise of a fundamental first amendment
right as an expression of our religious beliefs, on a chain/neck-
lace, the Islamic Medallion (Crescent Moon and Star), which appears
to offend certain members of your staff.

    When we aren't wearing an undershirt beneath our uniform tops,
and the Islamic medallion can be seen hanging from our necks, your
staff says nothing to us about the medallions around our necks.
However, when we are wearing a undershirt beneath our uniform tops,
and the Islamic medallion is visibly displayed, your staff gives us
a direct order to put the medallion beneath the undershirt or risk
disciplinary reprisal and as we all know, subsequently, a loss of
all privileges after our return to the segregated maximum end of
the prison, and the staff tells us that they are only following
orders as sentdown from the superintendent's office.

    These actions are nothingless than intentional persecution
and harassment, as it appears that muslim inmates have been singled
out for selective punitive treatment for exercising an fundamental
right to religious expression. Which in no way serves as a threat
or compremises institutional security, unless certain staff finds

-2-    *R. A. pg. 18*

the Islamic religion distasteful as demonstrated by their attempts to suppress our fundemental expression of those rights, through their arbitrary, capricious and abusive exercise of limited powers under the color of law, for no other reason(s) than we are muslim and wear the Islamic medallion and not the cross, and it appears to offend their personal sensibilies, for whatever reason(s).

Additionally, I would like to bring a second issue to your attention at this time. Which is, there's an administrative requirement that all inmates who desire to attend Islamic Prayer Services on friday afternoon, must submit their names to the administration in advance as much as two to three weeks, to be approved to have their names placed upon a preapproved list in order to attend the Islamic services.

However, no such lists and requirements are necessary for inmates who desire to attend the Christian Services in the chapel on sundays. The block officers call chapel services and anyone can go to the chapel to attend the christian sunday services. Which appears to be another example of a double standard and intentional impediment to access the Islamic chapel.

Inconclusion, I hope that the issues that I've outlined via this letter can be addressed and corrected to everyones satisfaction and there will no longer be any reoccurrences of the concerns as outlined in this letter. Thank you for your time and attention to this matter.

Sincerely,

E X H I B I T   " J "



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*

*Leverett Saltonstall Building, Government Center*
*100 Cambridge Street, Boston, Mass. 02202*

*(617) 727-3300*

**Argeo Paul Cellucci**
*Governor*

**Kathleen M. O'Toole**
*Secretary*

**Michael T. Maloney**
*Commissioner*

**Kathleen M. Dennehy**
*Deputy Commissioner*

April 27, 1998



EXHIBIT
2

G. Saif Sabree, W-34619
Bristol II
MCI Cedar Junction
P.O. Box 100
South Walpole, MA 02071

Dear Mr. Sabree:

I am writing in response to your letter dated April 3, 1998 concerning your claim of religious and racial persecution and harassment at MCI Cedar Junction.

Please be advised that no inmate at MCI Cedar Junction is allowed to display any religious medal. The chain and religious medal must be kept under clothing to the extent possible. This is not directed at you or at any particular religious group. There is a security concern about the display of any item which could signify membership in a group and, therefore, we require that they not be displayed at all.

As for the requirement that Muslim inmates sign up for access to the prayer room on Fridays, I understand that this is also a security requirement since those inmates are <u>unsupervised</u> during this period of time, whereas inmates who attend other religious services are supervised at all times.

Given that MCI Cedar Junction is currently the Commonwealth's only level 6 correctional institution, I am sure that you will appreciate the need for security restrictions not otherwise required elsewhere.

Sincerely,

Michael T. Maloney
Commissioner

MTM/lao

cc:    John Marshall, Superintendent, MCI Cedar Junction

E X H I B I T   " K "

STATE DEPARTMENT OF CORRECTION

EXHIBIT

*14*

MCI–CEDAR JUNCTION AT WALPOLE

DISCIPLINARY REPORT

INMATE: Saif Sabree_____ ID#: W-34619 HOUSING UNIT: B1

DATE: 8-10-98 D-REPORT NO. 98-1623 R.A. pg. 81

OFFENSE(S) & CODE NO.: (18) Fighting  (8) Conduct which disrupts

MINOR_____ MAJOR ✓_____ REFERRED TO DISTRICT ATTORNEY_____

MAJOR_____ REFER TO SPECIAL DDU HEARING OFFICER_____

DESCRIPTION OF OFFENSE(S)

On 8-10-98 at approximately 11:15 am I C.O. O'Neil assigned to the Bristol One Housing Unit observed inmate Saif Sabree assaulting inmate David Reyes with closed fist punches to the face and upper body on the second tier. Emergency response was implemented and the fight broke up on its own, both inmates were placed in restraints and escorted to the HSU.

HAS INMATE BEEN PLACED ON AWAITING ACTION STATUS? YES ✓ NO____

REPORTING STAFF PERSON'S SIGNATURE _Tim O'Neil_

DAYS OFF Tue , Wed
Shift 7 1 3

_Tim O'Neil_
(PLEASE PRINT NAME)

SHIFT COMMANDER'S SIGNATURE _John Mc Gonagle_

DISCIPLINARY OFFICER'S SIGNATURE _____

APPEAL RESULTS_____

REVIEWING AUTHORITY_____  DATE:_____

MASSACHUSETTS DEPARTMENT OF CORRECTION

## DISCIPLINARY HEARING

```
┌──────────────────┐
│     EXHIBIT      │
│                  │
│       15         │
└──────────────────┘
```

INMATE: Saif Shabree                    #: W34619

REPORT #: 98-1623    DATE OF REPORT: 8-10-98   R.A. pg. 32

DATE OF HEARING: 8-28-98              HEARING OFFICER: Patrick M. Mulvey

1. The inmate was given at least 24 hours notice of the hearing (if no, attach 24 hour waiver) YES ___✓___   NO _____

2. The inmate is present before the hearing officer (if not, attach refusal to appear form) YES ___✓___ NO _____

3. The inmate has been advised of his right to remain silent, since the offense charged has, or may be referred to the District Attorney. The inmate has been further advised that his silence may be used to draw an adverse inference against him, but his silence alone may not be used to support a guilty finding. YES_____ NO ___✓___

4. The inmate requested representation  YES_____  NO ___✓___
   The inmate is represented by an attorney/law student  YES_____  NO ___✓___

   Name of legal representative: N/A

5. The inmate requested the presence of the reporting staff YES ✓ NO ✓

   The reporting staff person is present  YES_____  NO ✓
   If the inmate's request was denied, indicate the reason: N/A

6. Inmate challenges impartiality of the Hearing Officer.
   YES_____  NO ___✓___

   If yes, state reasons why: N/A

7. The hearing was tape recorded  YES_____  NO ___✓___

*****************************************************************************
### Requests and Motions

_____

_____

_____

                        N/A

_____

_____

_____

INMATE: J. Sabree _____    _____ 17-1005

8.    Witness:  If none requested, check here ____ R.A. pg. 33

A.    REQUESTED BY INMATE: (If any witness request is denied, a written
explanation of the reasons must be included as
part of the record)

(1) _____

(2) _____ N/A _____

(3) _____

> EXHIBIT
> 16

B.    REQUESTED BY HEARING OFFICER:

(1) _____

(2) _____ N/A _____

(3) _____

**************************************************************************

9.    Presentation of evidence:

A.    Inmate Statement

PLEA: NOT GUILTY ON ALL CHARGES _____

Statement in defense (summary):

INMATE SABREE STATES THAT THE I.P.S. UNIT "SET HIM UP", THEY
CALLED HIM DOWN TO N.M.S. AND THEN LOCKED HIM UP. DUE TO
THIS SITUATION IT GAVE THE INMATES IN THE UNIT A WRONG
IMPRESSION, ABOUT SOMETHING THAT HAPPENED WITH A NOTE AND THE LIBRARIAN, AND
THAT IS WHY THE FIGHT OCCURED.

B.    Reporting Staff Person's Statement:

_____

_____

_____

_____ N/A _____

_____

_____

_____

INMATE: _S. Sabree_    D-REPORT: _75-1623_

_R.A. pg. 34_

C:    Other Witness Statements: (If witness has been denied, indicate
                                reason(s) for denial in this space)

Witness #2   Name: _____

Statement: _____

_____
```
EXHIBIT
17
```

_____ N/A _____

_____

_____

Witness #3   Name: _____

Statement: _____

_____

_____ N/A _____

_____

_____

*********************************************************************

C:    Documentary Evidence:

    In addition to the Disciplinary Report, the Hearing Officer accepted
into evidence, and considered the following documents, physical evidence,
photographs/video tapes:

_____

_____

_____

_____ N/A _____

_____

_____

_____

INMATE: J. SABREE

D. NUMBER: 11-1683

FINDINGS: Guilty (18/8)

R. A. pg. 35

**Statement of Evidence Relied Upon to Support Findings:** (continue on Pg 4a if necessary)

IT HAS BEEN DETERMINED THAT INMATE SABREE IS GUILTY OF THE CHA(CE) LODGED AGAINST HIM. GUILTY FINDING IS BASED ON OFFICER O'NEILS WRITTEN DISCIPLINARY REPORT COUPLED WITH THE LACK OF A SIGNIFICANT DEFENSE FROM INMATE SABREE. THEREFORE, IT HAS BEEN CONCLUDED THAT ON 8-10-98 INMATE SABREE WAS INVOLVED IN A PHYSICAL ALTERCATION WITH INMATE DAVID REYES WHICH RESULTED IN EMERGENCY RESPONSE PROCEDURES BEING IMPLEMENTED (18/8)

EXHIBIT
18

**SANCTIONS AND RECOMMENDATIONS:**

CHARGE (18/8) - 3 WEEKS LOSS OF TV/RADIO
            3 WEEKS LOSS OF PHONE/CANTEEN

**REASON FOR SANCTION:**

THIS SPECIFIC SANCTION WAS IMPOSED TO INMATE SABREE AS A REMINDER TO HIM THAT FIGHTING IS NO WAY TO SOLVE A DIFFERENCE. INMATE SABREE, IF HE HAD A DIFFERENCE WITH SOMEONE, SHOULD HAVE TRIED TO TALK THINGS OVER OR SEEK STAFFS ASSISTANCE RATHER THAN FIGHTING.

The inmate has been advised of his right to appeal this decision within 5 working days of his receipt; to the Superintendent: XX

Hearing Officer Patrick M. Mulvey- [signature]          Date:

The inmate has been advised of the Hearing officer's decision and a copy of this document has been delivered to the inmate     XX



MCI–CEDAR JUNCTION

MASSACHUSETTS DEPARTMENT OF CORRECTIONS

APPEAL FORM

R.A. pg. 35

MCI WALPOLE

W.W.S-U.

SEP 11 10:08 AM '98

EXHIBIT

19

INMATE  Saif Sabree                              DISP. REPORT  98-1623

DATE:  9-1-98

(1)  **MINOR MATTERS** – If you wish to appeal the disposition of this case, you may request that a Hearing Officer review his/her findings.  Such appeal must be made in writing to the Disciplinary Officer within two (2) days upon receipt of these findings.  The Disciplinary Officer will schedule a hearing within a reasonable time.  The appeal hearing shall be conducted in accordance with the procedures govering hearings before a Hearing Officer on major matters except the provisions of 103 CMR 430.12(1) & (3) shall not apply.  You may take a further appeal of the findings of the Hearing Officer in accordance with section (2) below.

(2)  **MAJOR MATTERS** – If you wish to appeal the Hearing Officer's disposition of this case you may request that the Superintendent review the findings.  Such request must be made in writing within five (5) days upon receipt of these findings.

(3)  **MAJOR MATTERS RESULTING IN A SENTENCE TO THE DEPARTMENT DISCIPLINARY UNIT** – If you wish to appeal a sentence to the Department Disciplinary Unit, you have fifteen (15) days from the date of receipt of the Special Hearing Officer's finding in which to file an appeal in writing addressed to the Deputy Commissioner of Correction as designee for the Commissioner.

(4)  **THE COMMISSIONER OF CORRECTION REVIEWS ALL CASES INVOLVING LOSS OF GOOD TIME.**

PLEASE INDICATE THE SPECIFIC GROUNDS FOR YOUR APPEAL IN THE SPACE BELOW:  (Use additional paper if necessary)

See Attached Page two of this appeal

_Saif Sabree_                              _9/4/98_
Inmate Signature                          Date

Block 10 / Cell 55

Sept. 4, 1998

Mr. John Marshall, Jr.                    R.A. pg. 36
Supt. MCI Cedar Junct.

Re: Pge 2 - D-report appeal #98-1623

Mr. Marshall,

    Procedurally, I am appealing these guilty findings and sanctions to your office to let you know that I am not guilty of any rules violations for defending myself from another inmate, as a direct result of a orchestrated set-up and racist retaliation, by your staff, namely acting IPS Commander Steve DeArsie who has a history of such actions and IPS officer Alex Rodriguez and the 7am to 3pm shift commander on duty Aug. 2, 1998, at around 11:15 am. Who each participated in a created situation of implicating me together with three other inmates who already had violent assaultive prison historys (1 black, 1 Spanish and 1 white), whom I did not know or did not associate with in the block or prison. However, because the IPS and shift commander had me called out of the block to question about an alleged porn picture and letter, that was allegedly sent to Ms. McHaugh, the white female librarian, and a picture and letter that was not shown to me or to no one else, but was used as reasons to lock me and the other inmates up. Gave the inmates the

R.N. pg. 57

desired impression, that I had somehow sent the alleged picture and letter to the white woman and also had implicated the other inmates in this perverted act. And the following day, Aug. 3, 1998, when IPS Sgt. De Aisie came into the block with IPS officer Rodriguez, he did nothing to clarify the matter when talking to the other inmates and left them with the unspoken impression that I was the main culprit or suspect. Additionally, I feel the IPS actions were meant to not only be a threat because of the ongoing civil actions against certain white male staff members, but payback for not submitting to their intimidation and pressures to turn snitch/informant. And because of these racist and retaliatory acts by your staff, my life and personal safety has now been placed in jeopardy as shown by the Aug. 10th assault and serious eye injury I sustained which took several sutures to to close. And which I will again bring to the attention of Judge Hinkle of the superior courts on a third amended civil complaint for damages.

Sincerely,

*[signature]*

C.C. Elliot R. Levine, Esq.
     N. Quincy, MA. 02169
Commr. of Corr.
     Boston, MA. 02202

Execut. Secret. Dept.
of Public Safety
Boston, MA. 02108

MASSACHUSETTS DEPARTMENT OF CORRECTION

MCI-CEDAR JUNCTION @ WALPOLE

RESULTS OF APPEAL

EXHIBIT

22

TO: _____ _Sul____Subrce_____

RE:  D-REPORT NO._____ _88-1623____

R.A. pg. 38

DATE:_____

A.  BY THE DISCIPLINARY BOARD

   After reviewing your case involving the above-cited Disciplinary
   Report, the Hearing Officer finds as follows:

   _____

   _____

   _____

   _____

   _____
   Hearing Officer                    Date
   ****************************************************************

B.  BY THE SUPERINTENDENT

   After reviewing your case involving the above-cited Disciplinary
   Report, I find as follows:

   __Appeal denied - No Merit_____

   _____

   _____

   _____

   _____        9/4/98
   Superintendent                     Date

   A copy of this decision has been served on the inmate_____

   _____
   Staff Signature                    Date

E X H I B I T   " L "



EXHIBIT
7

## CORRECTIONAL MEDICAL SERVICES
### SICK CALL REQUEST FORM

Print Name: _Sabree, Saif_    ID#: _W34619_  R.A. pg. 24

Date: _Aug 14, 1998_    Housing Location: _B#10   WWSU_

Check **ONLY** One Box:   ☑ Medical   ☐ Dental   ☐ Mental Health

Nature of problem or request: _Could my motrin when needed_
_prescription be corrected. Having noor problems_
_Receiving it._

I consent to be treated by the health staff for the condition described above.

_Saif Sabree_
INMATE SIGNATURE

### PLACE THIS SLIP IN MEDICAL BOX OR DESIGNATED AREA
### DO NOT WRITE BELOW THIS AREA

**********************************************************

DATE RECEIVED:
8-14-98                        TRIAGE TO:

INSTITUTION                ☑ NURSE      ☐ PA/NP

Triaged by: _____         ☐ PHYSICIAN   ☐ OTHER

**********************************************************

Subjective: _States motrin issue cleared up - Pt feel lic -_

Objective: BP_____ P_____ R_____ T _9?6_
_Suture line intact; minimal erythema, 5 exp; PERRL, Eom_
_intact © subconjunctival hemorr. OD © skin line ; © edema_
Assessment: _no abscess area ©_

Plan:  _healed lac ①_
_① Subconjunctival hemorrage OD_
_healed lac ①_
_P ① Suture out_
_② Pt. follow up and to let CO's know if_
_feels worse to return_

Signature: _Nurse_    Title: _N_    Date: _8/14/98_  Time: _1415_

CMS 6022 11/94

# CORRECTIONAL MEDICAL SERVICES

## PROGRESS NOTES

K, A, pg. 25

CJ

_Institution_

**NAME:** Sabree, Saif     **ID #** W34619     **D.O.B.** 2/18/54

| DATE | TIME | NOTES |
|------|------|-------|
| 8/10/98 | 11:25 AM | I/m to HSU p̄ alleged altercation. Injuries include approx. 1/2" laceration under ⓡ eye. ⊕ swelling noted. Superficial laceration to inside of lower lip. Minimal amt. of bleeding. I/m c/o discomfort to back of neck. All areas cleansed c̄ NS, cold pack applied to ⓡ eye. S/o other injuries noted. ——————— Keva Brown R. |
| 8/10/98 | 14:50 | S as per ___ ___ ___ ___ |
|  |  | ___ A 92 |
|  |  | O HEENT; ___, Eyes - PERRL; O ___ |
| BP 130/70 - 84-16 |  | WNL; OD - periorbital edema + ecchymosis |
|  |  | ⓡ ___ ___ ___. ___ ___ ___ |
|  |  | ___ ___ ___. 1.5 cm superficial lac |
|  |  | below ⓡ ___ ___ ___; 5 PB |
|  |  | ___ ___ ___; ___ - WNL |
|  |  | c̄ TMJ bilaterally - ___ c.l. ___ |
|  |  | ___. ⊕ tenderness bil ___ |
|  |  | muscle. ROM ___ ___ ___ |
|  |  | upper ext ROM; legs, ___ ___ ___ |
|  |  | A: O ___ lac ___ |
|  |  | ② post Contusion |
|  |  | P: ① ___ 0.5 cc Im ① ___ ⓡ ___ |
|  |  | ② ___ cleanse c̄ NS ___ |
|  |  | ③ ___ c̄ ___ ___ ___ ___ ___ |
|  |  | ④ ___ S- c/o ___ ___ |
|  |  | ___ to 5 days ___ ⑧ ___ ___ ___ |

FORM #7113 W 1/95

EXHIBIT
9

# CORRECTIONAL MEDICAL SERVICES
## PROGRESS NOTES

R. A. pg. 26
CU

NAME: Saif Sibvee          ID# W39619    D.O.B. 2/18/54    Institution

| DATE | TIME | NOTES |
|------|------|-------|
| 10/9/ | 1530 | Ⓞ Pt. seen for Mental Health Status Update 2nd to being sent to WWSU. See update for details. Pt. had just been bitten by fellow inmate. Pt. stated he was set up & is angry about that.<br>Ⓐ Logical, coht, per LOD, oriented X3, mood angry, affect appropriate.<br>⊖ Suicidal ideation<br>⊖ A/V hallucination or delusions<br>Ⓟ No M.H. f/u as per zasodopil but regular weekly monitoring on seg rounds & Monthly Mental Health Status Update<br>David J. Brynohan, PhD<br>Mental Health Director |
| 9-10-98 | 6:00 PM | Ⓞ M.S. update 10B. No concerns/problems noted. No M.H. issues raised. No crisis or distress observed.<br>A. No evidence of M.M.I. No overt symptoms of mood/thought disorder. ⊖ neuro veg.<br>⊖ del/hall. ⊖ H.I.S.I. Presents stable & in control.<br>P. Monitoron M.H. Seg Rounds. M.H. as needed.<br>Paul Garmda MA, L.M.H.C. |
| | GARR100 | |

FORM #7113 B 1/95                    MENTAL HEALTH

# CORRECTIONAL MEDICAL SERVICES

## PROGRESS NOTES

R. A. pg. 27

<u>CO</u>
Institution

10

NAME: _Salru Say_   ID # _WB 3467_   D.O.B. _3/11/64_

| DATE | TIME | NOTES |
|------|------|-------|
| 8/10/98 | 16:00 | TD · 0.5 mL X1 given 5 precedent (4) detoil |
|  |  | _Heather S_____ |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

11

# CORRECTIONAL MEDICAL SERVICES

## PHYSICIAN'S ORDER

R. A. pg. 28

---

**PRESCRIPTION ORDER - FOR DEPARTMENT OF CORRECTION INSTITUTIONAL USE ONLY**

NAME _Sabre Saif_     ID NUMBER _W34617_   D.O.B. _2-18-54_

INSTITUTION _C J_     ALLERGIES _cotrespm drc_

DATE _8-10-98_    TIME _1430_

| PROBLEM | ORDERS |
|---|---|
| falid bu. | ① Td 0.5 cc IM    _given #P 8P ns_ |
| fud contus | ② Suturs Out 8/15/98 |
| | ③ cephxn 600 mg PO Bid pen x 5 days |
| | ④ ca D P f/u to 24 hs |

_noted Hudu Supson 8/10/98 1940_

AUG 1 3 1998

KHALID N. KHAN, M.D.

1431

---

SIGNATURE _McCu_     Interchange is mandatory unless the prescriber writes the words "no substitution" in this space:

PRINT NAME _McCu_

DEA Reg. # _____
For Controlled Substance orders)

AS 8006 REV 5/96

# Supreme Judicial Court for the Commonwealth of Massachusetts
### One Beacon Street, Third Floor, Boston, Massachusetts 02108
### (617) 557-1020

G. Saif Sabree
M.C.I. Norfolk  (W34619)
P.O. Box 43
Norfolk, MA 02056

RE:  Docket No. FAR-14510

**G. SAIF SABREE**
**vs.**
**PAUL CONLEY & others**

        Middlesex Superior Court No. MICV2000-01456
        A.C. No. 2002-P-1267

                NOTICE OF DENIAL OF F.A.R. APPLICATION

        Please take note that on 12/23/04, the above-

captioned Application for Further Appellate Review was denied.

                            Susan Mellen, Clerk

Dated: December 23, 2004

To:  G. Saif Sabree
        Richard C. McFarland, Esquire

elements or parts of the crime charged"; and that, "[i]f you [the jury] evaluate all the evidence and you still have a reasonable doubt remaining, then [the defendant] is entitled to the benefit of that doubt and he must be acquitted.' Viewed as a whole, we conclude that the instruction correctly conveyed to the jury the level of proof required to convict the defendant." *Id.* at 572, 688 N.E.2d 20.

*Judgment affirmed.*



Paul CONLEY & others.[1]

v.

G. Saif SABREE

62 Mass.App.Ct. 901

No. 02-P-1267.

Appeals Court of Massachusetts.

Sept. 27, 2004.

**Background:** Former prison inmate brought action against Department of Correction and several correction officers, alleging that visual body cavity search conducted on him during his incarceration, as well as his transfer to less desirable cell, violated his civil rights under State Civil Rights Act and § 1983, as well as his constitutional rights. Department of Correction filed motion for summary judgment. The Superior Court Department, Suffolk County, Diane M. Kottmyer, J., granted motion. Former prison inmate appealed.

**Holdings:** The Appeals Court held that:
(1) former inmate failed to show that there were any threats, intimidation, or coercion on part of correction officers who conducted search, as necessary to establish claim for damages under State Civil Rights Act;
(2) correction officers who conducted search of former inmate were entitled to qualified immunity, with respect to former inmate's § 1983 claims; and
(3) former inmate's Eighth Amendment right to be free of cruel and/or unusual punishment was not violated by search.

Affirmed.

**1. Civil Rights ⟐1098**

Former prison inmate failed to show that there were any threats, intimidation, or coercion on part of correction officers who conducted visual body cavity search on him before inmate was returned to their housing units from prison's recreation yard, as necessary to establish claim for damages under State Civil Rights Act; even if manner of conducting search was unreasonable, there was no evidence that it was conducted for illegitimate or vindictive purpose. M.G.L.A. c. 12 § 11H.

**2. Civil Rights ⟐1376(1, 2)**

Defense of qualified immunity invokes a three-part inquiry: first, whether a constitutional violation has been alleged; if true, second, whether the law was clearly established at the time of the alleged violation; and last, whether a reasonable official, similarly situated, would understand that the challenged conduct violated a constitutional norm. 42 U.S.C.A. § 1983.

**3. Civil Rights ⟐1376(7)**

Correction officers who conducted visual body cavity search of former prison inmate before inmates were returned to their housing units from prison's recreation yard, could not be returned to their housing units from prison's recre-

ation yard were entitled to qualified immunity, with respect to former prisoner's civil rights claims under § 1983; while factual disputes existed as to whether officers unreasonably failed to secure search against visual intrusion, officers were not on fair notice that search violated Fourth Amendment, and, officers could have characterized any potential view of searches as no more than inadvertent, occasional, casual and/or restricted, and could have further found small risk of such incidental viewing to be outweighed by need for expediency. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**4. Prisons ⟐4(7)**

Strip searches conducted in nonprivate areas of a prison, viewed by nonessential persons, particularly of the opposite sex, violate the Fourth Amendment unless justified by legitimate penological interests. U.S.C.A. Const.Amend. 4.

**5. Civil Rights ⟐1376(2)**

Qualified immunity under § 1983 insulates all but the plainly incompetent or those who knowingly violate the law. 42 U.S.C.A. § 1983.

**6. Civil Rights ⟐1376(7)**

The violation of prison regulations does not by itself forfeit qualified immunity for law enforcement officials under § 1983. 42 U.S.C.A. § 1983.

**7. Declaratory Judgment ⟐84**

Former prison inmate's claims for injunctive and declaratory relief, arising from visual body cavity search conducted on him by correction officers before inmate was returned to their housing units from prison's recreation yard, could not proceed, as inmate was no longer incarcerated, and search appeared to have been isolated incident.

**8. Prisons ⟐4(7)**
**Sentencing and Punishment ⟐1545**

Former prison inmate's Eighth Amendment right to be free of cruel and/or unusual punishment was not violated by visual body cavity search conducted on him before inmates were returned to their housing units from prison's recreation yard; inmate was unable to show unnecessary and wanton infliction of pain unrelated to prison needs. U.S.C.A. Const.Amend. 8.

**9. Civil Rights ⟐1404**

Former prison inmate failed to raise any inference of retaliatory motive, with respect to inmate's transfer to less desirable prison cell after inmate filed grievance to superintendent of prison, complaining of open nature of visual body cavity search conducted on him before inmates were returned to their housing units from prison's recreation yard, as necessary to establish claim of retaliation against Department of Correction for exercise of First Amendment right to file grievance; inmate's bare allegations did not show reasonable expectation of proving rigid seniority system for assigning prison cells. U.S.C.A. Const.Amend. 1.

**10. Prisons ⟐1(7)**
**Sentencing and Punishment ⟐1539**

Former prison inmate failed to establish "conditions of confinement" claim pursuant to Eighth Amendment; while lack of basic sanitation and hygiene might constitute conditions sufficiently serious such as to result in denial of minimal civilized measure of life's necessities, former inmate did not claim that toilet and sink in cell to which he had been transferred were inoperable, but only that they were rusted and "bacteria-laden," and that his cell smelled of human waste, nor did he make out, by his conclusory allegations, violations of sanitary and safety regulations, which would

---

1. John Pedvaikas, Scott Galsband, and John Brodbeck.

tive of ensuring prison security, we are cautioned to remain mindful of "the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Cooksh v. Powell*, *supra* at 449 n.11, quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Qualified immunity insulates reasonable errors of judgment, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). See, e.g., *Richardson v. McKnight*, 521 U.S. 399, 408, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997); *Saucier v. Katz*, 533 U.S. at 201–202, 206, 121 S.Ct. 2151. In addition, the violation of prison regulations does not by itself forfeit qualified immunity. See *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

[7, 8] Sabree's claims for injunctive and declaratory relief cannot proceed as he is no longer an inmate at the facility and is no longer an inmate at the facility and have been an isolated incident.[5] See *Shaheed-Muhammad v. Dipaolo*, 138 F.Supp.2d 99, 105–106 (D.Mass.2001); *Seaver v. Mandozo*, 178 F.Supp.2d 30, 36 (D.Mass.2002). See also *Boston Herald, Inc. v. Superior Ct. Dept. of the Trial Ct.*, 421 Mass. 502, 504, 658 N.E.2d 152 (1995); *Pidge v. Superintendent, Mass. Correctional Inst., Cedar Junction*, 32 Mass.App. Ct. 14, 19–20, 584 N.E.2d 1145 (1992).

II. The judge did not err in allowing summary judgment on plaintiff's claims related to his transfer to a less desirable cell.

---

On July 5, 1998, Sabree sent a grievance to the superintendent of the prison, complaining of the open nature of the search. Sabree alleged harassment due to his race, religion, and recent prisoner litigation. The superintendent replied, on July 17, 1998, that all of the inmates in the yard had been searched. On or about July 24, 1998, Paul Conley, one of the guards who conducted the search, ordered Sabree moved from his cell on the first tier to a cell on the second tier. Sabree remained in the new cell, which he claims to have been in disrepair, for twenty-three hours per day for one to two weeks. It is not contested that inmates on the first tier were routinely moved to accommodate those with medical needs. However, Sabree asserted "personal knowledge" that Conley departed from unwritten seniority procedures regarding placement in cells on the first tier. Conley denied any seniority policy, as such a policy would "create expectations" and cause "complaints and tensions" where deviations were necessary. Conley cited several factors generally used to place inmates and denied retaliation.

[9, 10] The defendants do not contest that Sabree had a right under the First Amendment to the United States Constitution to file a grievance and that Conley could not retaliate against him for doing so. See, e.g., *Shabazz v. Cole*, 69 F.Supp.2d 177, 197 (D.Mass.1999); *Longton v. Secretary of Pub. Safety*, 87 Mass. App.Ct. at 18–20, 636 N.E.2d 299; *Murphy v. Cruz*, 52 Mass.App.Ct. 314, 319, 783 N.E.2d 150 (2001). Nevertheless, the judge correctly allowed the defendants' motion for summary judgment, as the rec-

---

ord raised no inference of retaliatory motive. See *Messere v. Commissioner of Correction*, 27 Mass.App.Ct. 542, 548–549, 540 N.E.2d 209 (1989); *Pulcio v. Commissioner of Correction*, 52 Mass.App.Ct. 302, 313, 763 N.E.2d 814 (2001). While the chronology of events can in some circumstances defeat a motion to dismiss, it cannot create a triable issue when the defendants have produced evidence of a legible, but only that they were rusted and "bacteria-laden" and that his cell smelled of human waste. Contrast, e.g., *Michaud v. Sheriff of Essex County*, 390 Mass. 523, 458 N.E.2d 702 (1983). Nor did Sabree make out, by his conclusory allegations, violations of health and safety regulations he cited (166 Code Mass. Regs. §§ 451.117, 451.120, 451.130 (1999)); 105 Code Mass. Regs. § 451.123 (1999); 105 Code Mass. Regs. § 451.130 (1999)), which would not in any event make out a private cause of action against prison officials. See *id.* at 526, 458 N.E.2d 702; *Hudson v. Commissioner of Correction*, 46 Mass.App.Ct. 538, 548 n. 18, 707 N.E.2d 1080 (1999). Given that the plaintiff's brief stay in the allegedly offending cell ended long ago, the judge property treated the claim as moot.

[11] Plaintiff also raised a "conditions of confinement" claim pursuant to the Eighth Amendment to the United States Constitution. See *Farmer v. Brennan*, 511 U.S. 825, 832–833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Sabree must show two conditions "sufficiently serious" as to "result in the denial of the 'minimal civilized measure of life's necessities.'" *id.* at 834, 114 S.Ct. 1970, quoting from *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and (2) that the defendants acted with "deliberate indiffer-

---

*ence*" to his health or safety. *Farmer v. Brennan*, 511 U.S. at 834, 114 S.Ct. 1970. That test does not create a constitutional right to stainless steel facilities or spotless, odor-free cells. While a lack of basic sanitation and hygiene may satisfy this test, see, e.g., *Masonoff v. DuBois*, 899 F.Supp. 782, 788–789 (D.Mass.1995), Sabree did not claim that his toilet and sink were inopera-

---

526, 458 N.E.2d 702; *Michaud v. Sheriff of Essex County*, 390 Mass. 523, 458 N.E.2d 702 (1983). Nor did Sabree make out, by his conclusory allegations, violations of health and safety regulations he cited (166 Code Mass. Regs. §§ 451.117, 451.120, 451.130 (1999); 105 Code Mass. Regs. § 451.130 (1999)), which would not in any event make out a private cause of action against prison officials. See *id.* at 526, 458 N.E.2d 702; *Hudson v. Commissioner of Correction*, 46 Mass.App.Ct. 538, 548 n. 18, 707 N.E.2d 1080 (1999).

*Judgment affirmed.*

The case was submitted on briefs.



---

5. Insofar as Sabree's claim pursuant to the Eighth Amendment to the United States Constitution related to the strip search is susceptible to independent analysis, he is unable to show "the unnecessary and wanton infliction of pain," unrelated to prison needs. *Whitley v. Albers*, 475 U.S. 312, 319–320, 106 S.Ct.

1078, 89 L.Ed.2d 251 (1986). See *Del Raine v. Williford*, 32 F.3d 1024, 1040 (7th Cir. 1994). The due process clause also fails to provide greater protection. See *Fernandez v. Rapone*, 926 F.Supp. 255, 262–263 (D.Mass. 1996). See also *Oliver v. Scott*, 276 F.3d 736, 744–745 & n. 11 (5th Cir.2002).

Exhibit "N"

# Supreme Judicial Court for the Commonwealth of Massachusetts
### One Beacon Street, Third Floor, Boston, Massachusetts 02108
### (617) 557-1020

```
G. Saif Sabree
MCI Norfolk    (W-34619)
P.O. Box 43
Norfolk, MA 02056
```

RE:  Docket No. FAR-14324

**G. SAIF SABREE**
**        v.**
**SUPERINTENDENT, MASSACHUSETTS CORRECTIONAL INSTITUTION, CEDAR**
**JUNCTION, & others**

Suffolk Superior Court No. SUCV1998-05505
A.C. No. 2002-P-1033

NOTICE OF DENIAL OF F.A.R. APPLICATION

Please take note that on 09/30/04, the above-

captioned Application for Further Appellate Review was denied.

Susan Mellen, Clerk

Dated: September 30, 2004

To:  G. Saif Sabree
     Thomas E. Abruzzese, Esquire

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

02-P-1033

G. SAIF SABREE

vs.

SUPERINTENDENT, MASSACHUSETTS CORRECTIONAL INSTITUTION, CEDAR JUNCTION, & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The plaintiff is a prisoner who seeks declaratory and injunctive relief as well as civil damages for alleged violations of his State and Federal civil rights that resulted from an institutional investigation.  An unknown inmate, evidently not the plaintiff, sent a sexually explicit letter and a nude photograph to a female employee (the prison librarian).  The plaintiff was interrogated by a defendant correctional officer concerning this incident and denied involvement.  He was advised, "watch your back," which he took as a threat rather than a warning.

Another inmate who was being investigated as the possible culprit supposedly came to believe that the plaintiff placed the blame on him and instigated a fight in which the plaintiff suffered an eye injury.  Believing that the correctional

---

[1] Several employees of MCI, Cedar Junction, individually and in their professional capacities.

officials involved in the investigation wanted to set him up (and had orchestrated the fight) for his refusal to become an informant, he brought this pro se complaint against the defendants, alleging (inter alia) violations of G. L. c. 12, §§ 11H and 11I, 42 U.S.C. § 1983, the Eighth Amendment and due process clause of the United States Constitution, and retaliation for bringing unrelated litigation.  A Superior Court judge, on cross motions for summary judgment, denied the plaintiff's motion and allowed the defendant's, dismissing all claims.  The plaintiff appeals.

We have reviewed the summary judgment materials and conclude there are no material facts in dispute and that the defendants were entitled to judgment as a matter of law.  Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983).  Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).  For the reasons stated in the Commonwealth's brief on pages four through twelve, we affirm.

Judgment affirmed.

By the Court (Greenberg,
  Grasso & Green, JJ.),

Ashley Ahea

Clerk

Entered:  January 20, 2004.

2

(Rev. 12/96)

# CIVIL COVER SHEET

ATTACHMENT #2

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

G.SAIF SABREE, PRO SE,

**DEFENDANTS**

JOHN MARSHALL, JR.,
SUPT. MCI CEDAR
JUNCT. AND OTHERS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Norfolk
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Worcester
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

05 R 10660 WGY

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)

NANCY A. WHITE, GEN. COUNSEL
MASS. DEPT. OF CORR., SUITE 600
70 FRANKLIN ST., BOSTON, MASS.02110

## II. BASIS OF JURISDICTION    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Habeas Corpus: | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other |  |  | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property |  / ☒ 550 Civil Rights |  |  |  |
|  |  / ☐ 555 Prison Condition |  |  |  |

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

42 U.S.C.A. § 1983 VIOLATION OF RELIGIOUS FREEDOMS AND CRUEL AND
UNUSUAL PUNISHMENT OF A PRISONER

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY    (See instructions):

JUDGE    NONE    DOCKET NUMBER

DATE  3/28/05

SIGNATURE OF ATTORNEY OF RECORD  H. Saif Sabree, pro se

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ATTACHMENT #3

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)  G. SAIF SABREE, PRO SE V.
   JOHN MARSHALL, JR., ET AL.

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE
   CIVIL COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

   ___ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___ II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,       05 - 10660 WGY
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    *Also complete AO 120 or AO 121
                                                                              for patent, trademark or copyright cases

   ___ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   ___ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   ___ V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES.  (SEE LOCAL RULE 40.1(E)).
   NONE

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?                                                      YES ☐      NO ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC 2403)                        YES ☐      NO ☐
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                               YES ☐      NO ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO
   TITLE 28 USC 2284?                                          YES ☐      NO ☒

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS
   (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).              YES ☐      NO ☐
   OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? -
   (SEE LOCAL RULE 40.1(D)).                                   YES ☐      NO ☒

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF
   THE DISTRICT?                                               YES ☐      NO ☒
   (a)    IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?_____

9. IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?    NORFOLK

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL
    AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE
    CENTRAL SECTION;  YES ☐  NO ☒       OR WESTERN SECTION;  YES ☐     NO ☒

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  NANCY A. WHITE, MASS. DEPT. OF CORR., LEGAL DIV. suite

ADDRESS    600, 70 FRANKLIN ST., BOSTON, MASS. 02110 (DEFENDANTS)

TELEPHONE NO._____

(Categfrm.rev - 3/97)