UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS



G.SAIF SABREE, PRO SE,                    )
            PLAINTIFF/PETITIONER,         )
                                          )
VS.                                       )  C.A. NO.
                                          )
JOHN MARSHALL, JR., SUPERINTENDENT        )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION; STEVE DE'ORSEY, SARGEANT  )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION; JOHN DOE, CAPTAIN/SHIFT   )
COMMANDER MASSACHUSETTS CORRECTIONAL      )
INSTITUTION CEDAR JUNCTION; ALEX          )
RODRIGUEZ, CORRECTIONAL OFFICER           )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION; PAUL CONLEY, SARGEANT     )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION; SCOTT GALSBAND, SARGEANT  )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION; JOHN DOE, CORRECTIONAL    )
OFFICER MASSACHUSETTS CORRECTIONAL        )
INSTITUTION CEDAR JUNCTION AND JOHN DOE   )
PADVAIKAS, CORRECTIONAL OFFICER           )
MASSACHUSETTS CORRECTIONAL INSTITUTION    )
CEDAR JUNCTION,                           )
            DEFENDANTS/RESPONDENTS.       )

## AFFIDAVIT OF G.SAIF SABREE IN SUPPORT OF VERIFIED CIVIL RIGHTS COMPLAINT WITH JURY DEMAND

    I, G.Saif Sabree, a pro se state prisoner, hereby deposes
and says on oath, that the following is truthful and accurate
the best of my personal knowledge and observations of the facts
herein submitted as evidence:

    1.  I am the affiant making this affidavit in support of
my verified civil rights complaint with a jury demand.

    2.  I am a documented and departmentally known prisoner
who is a practioner of the Islamic Faith for more than 20
years prior to the hereinafter described events beginning
on July 3, 1998, at about 11:00 a.m., while the plaintiff
was confined at the Massachusetts Correctional Institution

Cedar Junction (MCI-CJ) and housed in the Bristol-One segregation unit (seg unit) and returning to this cell block and cell from his once-per-week-one-hour-outdoor-recreational-period, he was deliberately subjected to by the defendants Paul conley, Scott Galsband and John Doe Padvaikas, on the orders of the MCI-CJ shift commander John Doe Brodbeck, to a "public outdoors full body cavity strip searching in plain unobstructed view of strangers of the opposite and same sex, e.g, male and female staff and officers, and female and children visitors of inmates, that was demeaning, humiliating, dehumanizing, embarassing and disrespectful to him as a muslim, in violaiton of his rights to religious freedoms and the cruel and unusual punishment of a prisoner.

3. The defendants actions forced the plaintiff to get completely naked, under threat of being placed in even more restrictive housing if he refuse to comply with the order. An order that required him to strip of all clothing and hand the clothing items and etc to the attending officers, outdoor's and in front of his cell block in complete and unobstructive view of members of the opposite sex, supra, who were exiting and entering the prison's main/front pedestrian security trap.

4. The outdoor full body cavity strip search was an exaggeration to alleged legitimate security objectives, which forced the plaintiff to expose his genitals, buttocks and his rectal areas to the strangers of the opposite sex and to two other prisoners: Kenneth Barlet W52822, a black inmate and a lighter skinned hisspanic inmate, about five-feet-five-inches and one-hundred and twenty pounds, who goes by the name shorty and was transfered to the gang block shortly after the incident.

The defendants public outdoor's full body cavity strip searching
of the plaintiff was a violation of his sincerely held religious
beliefs and practices and the defendants deliberately ignored
established constitutional law of seeking alternate location
that would have been the least restrictive means to achieve the
alleged legitimate prison security objective, when they forced
the plaintiff to submit to a public outdoor fully body cavity
strip searching in the obstructed view of members of the opposite
sex, which required the plaintiff to:

a) remove all clothing, and hand the clothing items
and etc to the attending officers who then searched
his clothing;

b) spread his fingers and show hands, back and front
and wiggle fingers;

c) open mouth and lift tongue;

d) show each ear;

e) raise arms to shoulder level stretched out to
the side;

f) lift penis and testicles and move them to one-
side and then to the otherside;

g) turn around and show back, lift each foot and
show the soles of each foot and then

h) bend over at the waist and spread his buttocks
to the officers.

6. The actions of the defendants were a violation of the
plaintiff's sincerely held religious beliefs and practices that
he has held for more than twenty-years, which is supported by
Qur'anic law relative to dress and undress and the regulation
of behavior between the sexes, when the defendants exaggerated
their alleged legitimate prison security goals when they forced
the plaintiff to expose himself to strangers and others in the
complete unobstructed view of the opposite sex, without the

defendants first attempting to exercise an available alternate location and least restrictive means for the strip searching such as the isolated exterior corridor that leads to and from the plaintiff's Bristol unit from the exercise yard or the HSU (health services unit) or the newman section of the prison that was not more than one-hundred feet away.

    7. The Holy Qur'an, sura/chapter 24, ayat/verse 30, 31, 58, 59 & 60, reads as follows:

> ayats/verses 30— 31: Say to the believing men that they should lower their gaze and guard their modesty, that will make for greater purity for them and Allah is well acquainted with all that they do.

> And say to the believing women  that they should lower their gaze and guard their modesty, that they should not display their beauty and ornaments except what ordinarily appears therof, that they should draw veils over their bosoms and not display their beauty except to their husbands, their fathers, their husband's father, their sons, their husband's sons, their brother's or their brother's sons, or their sister's sons, or their women, or the slaves (servants) whom their right hand possess, or male attendants free from sexual desire. Or small children who have no carnal knowledge of woman; and that they should not strike thier feet in order to draw attention to their hidden ornaments. And oyou Believers! turn you all together towards All in repentence that you may be successful.

> ayats/verses 58, 59 & 60: O you who believe! let those whom your hand possess, and the children amoung you who have not  come of age ask your permission before they come into your presence, on three occasions: before morning prayer; the while you doff (to remove) your clothing for the noonday heat; and after the late night prayer. These are your three times of undress. Outside those times it is not wrong for you or for them to move about attending each other. thus does Allah make clear the signs to you, for Allah is full of knowledge and wisdom.

> But when the children amoung you come of age, let them also ask for permission, as do those before them: Thus does Allah make clear his signs to you: for Allah is full of knowledge and wisdom.

> Such elderly woman as are past the prospect of
> marriage, there is no blame on them if they lay
> aside their outer garments, provided they make
> not a wanton display of their beauty, but it is
> best for them to be modest and Allah is One who
> sees and knows all things.

Holy Qur'an, text, English transliteration and commentary, by
Abdullah yusef Ali.

8.    The defendants Conley and Galsband were familar with the
plaintiff, with his religion and with his sincerely held religious
beliefs and practices. As the defendants were both supervising
officers who reviewed  cell block inmate movement rosters to
and from the muslim masjid/chapel, and the plaintiff's name is a
primary indicator of his religion, practices and they knew of his
religious dietary requirements during the month of Ramadan (fast-
ing), and on the date of the strip search the plaintiff was wearing
a neckless (medalion), e.g, the Islamic Crescent moon and star on
a chain, which all staff knew only muslims wore and displsyed as
part of their religion at MCI-Cedar Junction.

9.    The public outdoor fullbody strip searching of the
plaintiff by the defendants was a deliberate violaiton and burden
on his religious beliefs and practices, in violation of 103 DOC
506.00(Search Policy) and 103 DOC 505.00(Use of Force), which
carry the effect and force of law, and it was a malicious and
sadistic and cruel and unusual punishment of a prisoner, in an
attempt to advance alleged legitimate prison security goals to
attempt to find alleged contraband, e.g., cigarette butts left by
staff in the inmate recreation area.

10. On or about July 5, 1998 the plaintiff wrote to the
Superintendent MCI-Cedar Junction and filed an official complaint

which detailed what the inmate wanted to do to her sexually, and
the letter had my name involved in it.

17. I asked the IPS how did the letter involve me and my
name and the IPS told me that he did not want to go into that
and I asked the IPS could I see the alleged naked picture and
sexually explicit letter that he said had been sent to the white
librarian and the IPS told me that he had left it in the office. I
the told the IPS tha I was willing to give him a hand writing
sample to compare to that on the alleged letter if he needed it
and he told me that that had already been checked out by other
sources and he, the IPS knew that I did not write the letter.
However, what IPS Rodriguez wanted to know from me was to provide
him with informant information, i.e., with the name(s) of other
inmates who I think may have been the ones who sent the picture
and letter to the librarian and involved my name in it.

18. I refused to provide the IPS with the so called inform-
ant information he requested and told him that he would have to
check his other sources for informant information, and it was at
this time the IPS Rodriguez became agitated with me and stated
several times in the form of a threating question, "you're not
going to give me a name?" to which I stated to him "No. I'm not,
so go check your other sources." Also, at this time I began to
leave the basement when the telephone rang and the IPS gave me a
direct order     to stay put as he went to answer the phone. I
was within hearing distance     of the phone and could hear IPS
Rodriguez state to someone on the other end of the line "that he's
not giving me anything to go on (no informant information)."

19. After the IPS hung-up the phone he turned to me and again asked me in a threatening voice, "so you're not going to give me a name," and I told him no and I left the basement, the HSU and returned to my cell block and five minutes later the major prison inmate count was conducted.

20. After the count was conducted and I was in my cell waiting for the door to  open in order that I could go get my lunch meal, my block officer Jeff Cardin brought to my cell the my lunch meal and I asked him why was I being feed in my cell and also being held on AA (awaiting action) status when I had done nothing to expect to receive a disciplinary report (d-report). officer Cardin stated to me that as far as he knew I was not going to get a d-report, but was being placed on A.A. on the orders of the shift commander and he did not know why I was given an  AA lockdown.

21. Shortley after the c.o. Cardin brought my lunch to my cell other inmates came to my cell to let me know that four other inmates in the block had also been placed on A.A. status by the shift commander, which was: 1. David reyes, a hispanic inmate, 2. Reynard Grassey, a white inmate, who lived on my tier, 3. Melvin Brown, a black inmate and 4. Jonathan Kirkland, a black inmate, who both lived on the third tier of the cell block.

22.The other inmates that came to my cell were friends and associates of the white and hispanic inmates, ¶21, supra, and they had came to my cell to ask me why was they all locked-up and what did I tell the IPS about them which had got everyone locked-up, and no one in the administration had come to them and told them anything as a reason for the lock-up. I sent word back

to the two inmates through their friends to tell them that I did
not know them or their names, I did not associate with them and
I did not tell the IPS or any other officer anything about them
because no one's name was mentioned in anything but mine and if
they wanted to know why they were locked-up they should ask to
see the IPS or the shift commander.

23. The following day, August 3, 1998, a monday, sometime
before 10; a.m., another inmate inmate known as "fourty" came to
my cell to tell me that the acting IPS commander Steve DeOrsey
and IPS Rodriguez were in the block and I used my hand mirror to
locate the IPS. Where I observed IPS DeOrsey on the second tier
in front of   the white and hispanic inmates cells talking to
them and IPS Rodriguez leaning on the c.o. Cardin's desk talking
to him on the flats. Within several minutes while I continued
to talk to inmate fourty who was standing in front of my cell,
IPS DeOrsey walked passed my cell, looked at me with a sarcastic
smirk, walked to the end of the tier, came back down the tier
and returned to the flats to where IPS Rodriguez was talking to
the block officer.

24. When c.o. Cardin brought me my lunch meal to my cell, I
asked him was I still locked-up on A.A. status and he told me that
he was told by the IPS that someone had sent a naked picture and
sexually explicit letter to the white female librarian, and the
had been signed "from the Sabree Crew," but everyone knew that I
had been set-up. I then asked c.o. Cardin how does that justify
my lock-up and my alleged involvement with the other inmates if
no ones elses name is mentioned in the alleged letter but mine.
C.o. Cardin then told me that I would have to ask the IPS about
that because my being locked-up on A.A. was totally based on

what the IPS told the shift commander and the prison administration, and it all somehow involves the other four inmates.

25. On August 5, 1998, 3 days following me and the other 4 inmates A.A. lock-up, and 2 days after IPS DeOrsey and Rodriguez appearance in the Bristol block and conversation with the hispanic and white inmates, where no other prisoners were interviewed but the me regarding the alleged naked picture and sexually explicit letter for possible misconduct, me and the other four prisoners were released from our cells and taken off the A.A. status without any explanations for the administration locking us up to begin with.

26. After our release from A.A. inmates Reyes (hispanic) and Grassey (white) came to my cell and told me that IPS DeOrsey had told them that they were not suspected of being the ones involved in sending the naked picture and sexually explicit letter to the librarian. But until they catch the individual who actually sent the picture and letter to the librarian, something will be put into their files stating their names were involved with the attempted harassment of a female staff member.

27. What the inmates wanted to know from me was, was there anyone that I could think of who might have been the one who sent the picture or letter and did I tell them the truth about their names not being mentiioned when the IPS called me to the HSU about the matter.

28. Later in the morning on August 5th I was called to the HSU for an actual sick call to the see the medical staff. On My return to the block I was called by another staff member Rick Solomon who I have known for many years, and he asked me if we

Case 1:05-cv-10660-WGY    Document 3    Filed 03/31/2005    Page 10 of 12

could talk. Solomon told me that he understood that I had been
locked-up along with other inmates in our cells because my name
was involved with the alleged naked picture and letter that had
been sent to the librarian McNaught and I told him that it was
true that I and 4 four other inmates just got off lock-up for
the picture and letter, and the IPS told me that my name had been
signed on the letter stating that it was from the "Sabree crew,"
but they would not let me see the letter and the administration
and my block officer knows that I had nothing to do with it and I
was being set-up by someone.

29. Solomon told me that it was all a lie, and that my name
had not been signed on that letter and my name was not even ment-
ioned when he talked to librarian McNaught two days earlier, and
Solomon went on to tell me that he had talked to McNaught and
she told him that the letter had at the top of it a drawing showing
two people in a sexual position and the letter talked about what
they wanted to do to her sexually and it had been signed from the
"Melvin Brown crew," ¶21, supra, and it was not signed with my
name on it and McNaught had turned the letter over to the prison
administration and the IPS and they told her that they were going
to investigate the incident.

30. Solomon also told me that it was the IPS and probably
other staff that involved my name in this incident along with the
other inmates, and the IPS were either trying to turn me into one
of their informants or they were setting me up for something in
retaliation for the law suits and other written complaints about
the racial and religious harassment and discrimination by some
officers carried out against the black muslim population. And I
was also told by Solomon to be careful and watch my back in the

prison, because it had already been spread around the prison
that I was the one who sent the alleged naked picture and letter
to the librarian and I was the one that involved the other inmates
in the incident.

31. On August 10, 1998, five days following me and the other
inmates lock-up and release from A.A. status, the hispanic inmate
Reyes who was convinced that it was me who sent the alleged naked
picture and sexually explicit letter to the white female librarian
and also involved his name in it, came into my cell and began
fighting with me, because the IPS did not call anyone but me to
question about the alleged incident, so it had to have been me
who involved him and the others in the alleged incident.

32. As a result of the IPS and other administration members
manipulations, orchestration and initiation to get inmate Reyes
to assault and start a fight with me in my cell, I sustained a
very serious right eye injury, resulting in a severely swollen
and partially shut right eye and open wound of approximately a $\frac{1}{2}$
inch on the uppercheek bone just below the right eye, that required
surgical suitures to close and my having to be medicated for pain
and an injury which to date continues to cause me eye starks from
nerve damage.

33. I believe that the actions, collectively and individually,
via the defendants deliberate manipulations, orchestration and
initiation of the fight between me and the hispanic inmate Reyes,
as a result of the defendants deliberately involving my name with
the hispanic, white and other two black inmates that were not
associates of mine, in the incident of the alleged naked picture
and sexually explicit letter being sent to the female librarian,

¶28 - 32, supra, was not only race based with animus-attached, but their actions were also meant to be retaliatory and punitive for my consistent refusal to provide the MCI-Cedar Junction IPS officers and prison administration with informant information about the doings of other inmates and staff members, and also in retaliation for my exercise of protected First amendment activities to petition the government, the courts and prison administration for the redress of grievances regarding the defendants treatment of him and the other black muslim prisoners at MCI-Cedar Jucntion.

34. this affidavit has been made, signed and executed under the penalties of jury, on this 28 of March, 2005.

Respectfully submitted by

G.Saif Sabree W34619 pro se, MCI-Norfolk/P.O. Box 43, Norfolk, Mass. 02056